UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>    v.<br><br>ERIC EUGENE LUNDIN,<br><br>                Defendant. | Case No.  13-cr-00402-JST-1<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**<br><br>Re: ECF No. 28 |

## I.    INTRODUCTION

Defendant Eric Eugene Lundin ("Defendant" or "Lundin") is charged with a single count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).  ECF No. 1. Lundin now moves to suppress evidence and statements obtained by officers of the Humboldt County Sheriff's Office ("HCSO") and the Arcata Police Department ("APD") on April 23 and 24, 2013.  Defendant's Motion to Suppress; Request for Evidentiary Hearing ("Motion"), ECF No. 28.  The matter came for hearing May 30, 2014.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Alleged April 22 Kidnapping and Assault

In response to a report of a kidnapping victim being treated in a hospital's emergency room in Arcata, California, HCSO Deputy Scott Aponte arrived at the hospital at approximately 12:30 a.m. on April 23, 2013 and interviewed Susan Hinds, the reported kidnapping victim.  Declaration of Humboldt County Sheriff's Deputy Scott Aponte ("Aponte Decl.") ¶ 3 (ECF No. 32-2); Exh. A to Declaration of Frederick W. Anderson ("Anderson Decl."), at C0002 (ECF No. 30-1). According to Hinds, as relayed to Aponte, the following transpired during the evening of April 22,

1    beginning at about 8:00 p.m..  Exh. A to Anderson Decl., at C0002; Exh. A[1] to Declaration of

2    Geoffrey Hansen ("Hansen Decl.") at C0093 (ECF No. 29-2).

3          Hinds was at her home while her son, Joseph Miller, was at the store.  Exh. A to Hansen

4    Decl., at C0093.   Hinds opened her front door in response to a knock and saw Defendant Eric

5    Lundin, known to Hinds as "Whitey," whom she thought of as a friend and who had served prison

6    time with Miller.  Id. at C0094, C0110, C0122.  Lundin grabbed Hinds by the neck, pushed his

7    way into the residence, and accused Miller of stealing Lundin's marijuana that he grew in his

8    home.  Id. at C0094, 0112.  Hinds said "[Lundin] grows pot.  I guess he has a card, whatever."  Id.

9    at C0113.  Lundin mentioned several times that his two daughters had been with him when he was

10   robbed.  Id. at C0116, C0122, C0133, C0150 (ECF Nos. 29-3 & 29-4).

11          While in Hinds' residence, Lundin made Hinds take pills Lundin described as methadone,

12   which he told Hinds would cause her to overdose.  Id. at C0095-96, 104-05 (ECF No. 29-2).  He

13   also pulled out two handguns from his pockets (a silver one and a larger black one), put one of the

14   guns against Hinds' temple, had her call Miller to tell him to come home, broke Hinds' television

15   by striking it with a gun, and broke Hinds' cellphone by throwing it across the room.  Id. at

16   C0101-102, 106.

17          During this series of events, according to Hinds, Lundin told Hinds multiple times she was

18   going to die and that he "leaves no witnesses."  Id. at C0096.  Lundin also stated, "You know

19   that's what us Mongols do . . . [w]e leave no witnesses – none of them."  Id. at C0105-06.  During

20   her interview with Deputy Aponte, Hinds asked Aponte, "Is the Mongols bad?" to which Deputy

21   Aponte responded, "It's a, uh, motorcycle gang – kind of like the Hell's Angels.  They're like the

22   Hell's Angels' rivals."  Id. at C0134 (ECF No. 29-3).

23          Next, as recounted by Hinds to Deputy Aponte, Lundin forced Hinds into his truck and

24   drove out of the trailer park in which Hinds lived.  Id. at C096 (ECF No. 29-2). They passed

25   Miller on their way out, at which point Lundin told Hinds to "[w]ave good-bye to your son.  You'll

26

27   [1] The court refers to this as "Exhibit A," as it is described on the document itself, see ECF No. 29-
     2 at ECF Page No. 1 of 24, although the transcript of the interview is labeled "Exhibit B" in the
28   ECF docketing system.

United States District Court
Northern District of California

never see him again." Id. at C0108.  Lundin also ordered Hinds take more of the supposed methadone pills.  Id. at C0096.  Later, Lundin contacted Miller over the phone and during their conversation, Lundin appeared to change his mind regarding Miller's involvement in the theft of Lundin's marijuana.  Id. at C0109-10.  Lundin then returned Hinds to her trailer park and explained that he had no intention of killing her but only wanted to scare her.  Id. at C0110, 115.

Shortly after concluding his interview with Hinds, Aponte interviewed Miller, who was also present at the hospital.  Exh. A to Hansen Decl., at C0147-160 (ECF No. 29-4).  Miller stated that "I guess someone went to rob his [Lundin's] house," and that "all . . . [Lundin's] weed's there. He's doing a grow.  He's a Mongol."  Id. at C0147.  Miller described receiving Lundin's call from his truck at about 10:00 p.m.  Id. at C0149.  Miller reported that Lundin told him he was "going to get his Mongol brothers to get [Miller] and whatever."  Id. at C0150.

### 2.    April 23 Search, Seizure and Questioning

Deputy Aponte then "contacted dispatch and requested a BOLO ["Be On the Lookout"] be issued for Lundin."  Aponte Decl. ¶ 6 (ECF No. 34-2); Exh. A to Anderson Decl., at C0003 (ECF No. 30-1).  Deputy Aponte "also requested that . . . [Lundin] be arrested pursuant to Cal. Penal Code § 836 for burglary, false imprisonment, kidnapping, vandalism, brandishing a firearm, administering a drug to commit a felony, administering a controlled substance, and battery." Aponte Decl. ¶ 6; Exh. A to Anderson Decl., at C0003.  "At this time . . . [Deputy Aponte] believe[s] that there was ample probable cause to seek and obtain a warrant for Lundin's arrest." Aponte Decl. ¶ 7.  Deputy Aponte appears to have begun preparing an incident report on these events at 2:23 a.m.  Exh. A to Anderson Decl., at C0001.

After receiving the BOLO, APD Officer Matthew O'Donovan drove to Lundin's home. Declaration of Arcata Police Officer Matthew O'Donovan ("O'Donovan Decl.") ¶¶ 3-4 (ECF No. 34-1).  Officer O'Donovan observed a vehicle that had been described as Defendant's, and saw that "[t]he lights were on inside the home."  Id. ¶ 4.  O'Donovan called for backup and was joined by APD Officer Jeremiah Kasinger, APD Sergeant Keith Altizer, and HCSO Deputy Matthew Tomlin.  Id. ¶ 5.  "At approximately 0354 hours," Officers O'Donovan and Kasinger and Deputy Tomlin approached the front door.  Id. ¶ 5.  Officer O'Donovan knocked on the door, waited about

United States District Court
Northern District of California

3

1    thirty seconds, and knocked again more loudly.  Id. ¶ 6.

2         After the second knock, Officer O'Donovan and Deputy Tomlin "heard a series of loud

3    crashes coming from the rear of the residence."  Id. ¶ 7; see also Exh. A to Anderson Decl., at

4    C0008 (ECF No. 30-1) (incident report of Deputy Tomlin that "I heard a crashing noise to the rear

5    of the residence.").  The officers "loudly identified [them]selves as police, and shouted for

6    Defendant to put his hands in the air and come out slowly."  O'Donovan Decl. ¶ 7; see also Exh. A

7    to Anderson Decl., at C0008 (incident report of Deputy Tomlin that "I started shouting at whoever

8    was on the back patio to come out with their hands up").  "The fence surrounding the backyard

9    was tall, but . . . [the officers] could hear Defendant moving around in the backyard."  O'Donovan

10   Decl. ¶ 8. "Defendant exited the backyard and was taken into custody by Deputy Tomlin."  Id.

11   Deputy Tomlin directed Lundin into a prone position on the ground, placed him into handcuffs,

12   and had him sit in Deputy Tomlin's car.  Exh. A to Anderson Decl., at C0008.

13        Officers O'Donovan and Kasinger then searched the home and the backyard.  Id. ¶ 9.

14   "While exiting the home," Officer O'Donovan "noticed a clear plastic freezer bag that contained

15   two firearms – a black semiautomatic and a silver revolver."  Id. ¶ 10.  "The handguns were in

16   plain view within arm's reach of the common walkway proceeding from the gate where we

17   entered the backyard."  Id.  Deputy Tomlin photographed the bag and picked it up, and Deputy

18   Aponte seized the bag when he arrived on the scene.  Id. ¶¶ 10-11; Aponte Decl. ¶ 9; Exh. A to

19   Anderson Decl., at C0009.

20        At the scene, an unidentified officer stated that Lundin is a "retired Mongol."  Exh. A to

21   Hansen Decl., at C0163 (ECF No. 29-4).  Deputy Aponte asked Lundin "you want to go by

22   Whitey or your, uh – your regular name?" and Lundin responded "[w]hatever you want to call

23   me."  Id. at C0164.  Deputy Aponte then read Lundin his Miranda rights, which Lundin invoked.

24   Id. at C0164-65.

25             **3.    April 24 Search**

26        On the morning of April 24, HCSO Deputy Todd Fulton prepared an affidavit, statement

27   of probable cause, and warrant application to search Lundin's home, which was signed by

28   Humboldt Superior Court Magistrate Judge Bruce Watson at 8:55 a.m.  Exh. A to Anderson Decl.,

United States District Court
Northern District of California

1  at C0012; Exh. B to Anderson Decl. (ECF No. 30-4).  Deputy Aponte and other officers then

2  executed the warrant and seized numerous items, including guns, cellular phones, a prescription

3  pill bottle for methadone, computers and hard drives, and various Mongol paraphernalia.  Aponte

4  Decl. ¶ 12; Exh. A to Anderson Decl., at C0004 (ECF No. 30-1).

5       Defendant was initially charged with state crimes in Humboldt County, and those charges

6  were later dismissed.  Defendant was charged with the current indictment on June 20, 2013.

7       **B.**    **Legal Standards**

8       Defendant's motion to suppress is brought on three grounds: that officers conducted an

9  unreasonable warrantless search on April 23, that officers conducted an unreasonable warranted

10  search on April 24, and that officers obtained statements from Lundin in violation of his <u>Miranda</u>

11  rights on April 24.

12       **1.**    **Warrantless Searches**

13       The Fourth Amendment protects individuals against unreasonable searches and seizures.

14  U.S. Const. amend. IV.  "Searches and seizures that offend the Fourth Amendment are unlawful

15  and evidence obtained as a direct or indirect result of such invasions is considered 'fruit of the

16  poisonous tree' and is inadmissible under the exclusionary rule."  <u>United States v. McClendon</u>,

17  713 F.3d 1211, 1215 (9th Cir. 2013) (<u>citing</u> <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-87

18  (1963)).  Searches of a person's home are presumably unreasonable without a warrant, and the

19  "burden of proving that a warrantless search or seizure falls within an exception to the warrant

20  requirement is on the government."  <u>United States v. Scott</u>, 705 F.3d 410, 416 (9th Cir. 2012).

21       **2.**    **Warranted Search**

22       Courts must show deference to a magistrate judge's determination of probable cause.

23  <u>Illinois v. Gates</u>, 462 U.S. 213, 236 (1983).  Nonetheless, courts are "not to defer to a warrant

24  based on an affidavit that does not provide the magistrate with a substantial basis for determining

25  the existence of probable cause."  <u>United States v. Leon</u>, 468 U.S. 897, 915 (1984) (internal

26  quotation omitted).  The affidavit supporting a search warrant must show a "'fair probability that

27  contraband or evidence of a crime [would] be found in' defendant's home."  <u>United States v. Hill</u>,

28  55 F.3d 479, 480 (9th Cir.1995) (alteration in original) (<u>quoting</u> <u>Gates</u>, 462 U.S. at 238).  Even

United States District Court
Northern District of California

5

when probable cause is actually lacking, suppression of evidence is not required if the "search [was] conducted in good faith reliance upon an objectively reasonable search warrant."  United States v. Crews, 502 F.3d 1130, 1135-36 (9th Cir. 2007) (citing Leon, 468 U.S. at 925).

### 3. **Miranda** Violations

"'[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination,' a requirement commonly satisfied by delivery to the defendant of the familiar 'Miranda warnings.'"  Dyer v. Hornbeck, 706 F.3d 1134, 1138 (9th Cir. 2013) cert. denied, 134 S. Ct. 82 (U.S. 2013) (quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966)).

## III.   ANALYSIS

Defendant argues that the evidence seized on April 23 must be suppressed, for two reasons: (1) that the officers' April 23 entrance onto Defendant' porch was an unreasonable search, and so all "fruits" of that search must be suppressed, and (2) that the officers' April 23 search of the Defendant's backyard and house was an unreasonable search, and so the evidence seized during that search must be suppressed.  Defendant also argues that deficiencies in the April 24 warrant require suppression of evidence seized on April 24, or at least an evidentiary hearing before that evidence can be admitted.  Finally, Defendant argues that statements obtained in violation of Defendant's Miranda rights must also be suppressed.  The court addresses each of these arguments in turn.

### A.   Entrance to Porch

The area "immediately surrounding and associated with the home" – i.e., the home's curtilage – is considered part of the home itself for Fourth Amendment purposes.  Florida v. Jardines, ___ U.S. ___, 133 S. Ct. 1409, 1414 (2013) (quoting Oliver v. United States, 466 U.S. 170, 182 (1984)).  "The front porch is the classic exemplar" of curtilage.  Jardines, 133 S. Ct. at 1415.  In its opposition brief, the government "does not dispute that Defendant had a Fourth Amendment interest in the 'curtilage' surrounding his home."  Government's Opposition to Defendant's Motion to Suppress ("Opp.") at 6:8-9, ECF No. 34.  "Nor does the government

United States District Court
Northern District of California

6

1    dispute that Defendant's front porch was curtilage and therefore subject to Fourth-Amendment

2    protection."  Id. at 6:9-10.[2]

3        Ordinarily, "[w]hen 'the Government obtains information by physically intruding' on

4    persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth

5    Amendment' has 'undoubtedly occurred.'"  Jardines, 133 S.Ct. at 1414 (quoting U.S. v. Jones,

6    565 U.S. ___, ___, n. 3, 132 S.Ct. 945, 950-951, n. 3 (2012)).  However, it is "a firmly-rooted

7    notion in Fourth Amendment jurisprudence" that a resident's expectation of privacy is not

8    violated, at least in many circumstances, when an officer intrudes briefly on a front porch to knock

9    on a door in a non-coercive manner to ask questions of a resident.  U.S. v. Crapser, 472 F.3d 1141,

10   1156 (9th Cir. 2007) (citing U S. v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).  The rationale

11   for permitting this intrusion is that, in our society, the resident of a home typically extends to

12   strangers an "implicit license . . . to approach the home by the front path, knock promptly, wait

13   briefly to be received, and then (absent invitation to linger longer) leave."  Jardines, 133 S.Ct. at

14   1415.  "Thus, a police officer not armed with a warrant may approach a home and knock, precisely

15   because that is 'no more than any private citizen might do.'"  Id. at 1416 (quoting Kentucky v.

16   King, 563 U.S. ___, ___, 131 S.Ct. 1849, 1862 (2011)).  This is referred to as the "'knock and

17   talk' exception to the warrant requirement."  United States v. Perea-Rey, 680 F.3d 1179, 1187 (9th

18   Cir. 2012).

19       The United States argues that the officers' approach to the front door qualifies as a

20   permissible "knock and talk" because their actions fell within the scope of a stranger's implied

21   license to knock on Lundin's door.  The court concludes that two compelling factors weigh in

22   favor of concluding that the officers' actions did *not* fall within the "knock and talk" exception.

23   _____

24   [2] Notwithstanding the unambiguous concession in its brief, counsel for the government changed
     course at the hearing and disputed that the area immediately outside Defendant's front door was
25   constitutionally protected "curtilage."  The government waived that argument by conceding it in
     its brief.  Even had the government not conceded the point, however, the court would reach the
26   same conclusion independently.  Applying the factors from United States v. Dunn, 480 U.S. 294,
     300-01 (1987), the court concludes that the semi-enclosed, semi-obscured front porch area
27   underneath the building's balcony and immediately outside the front door qualifies as an area the
     home's resident "reasonably may expect . . . should be treated as the home itself."  See Exh. A to
28   Declaration of Eric Lundin, ECF No. 31-1.

First, the officers' actions objectively indicate that their purpose was to locate and arrest Lundin, not to talk to him. Second, the approach took place at 4 a.m., and there are no facts indicating that Lundin extended an implied license to strangers to visit him at that hour. Taken in tandem, these two factors indicate that officers exceeded the scope of any implied license to intrude into Lundin's curtilage on the facts of this case.

### 1. The Officers' Purpose

In <u>Jardines</u>, the Supreme Court held that "the government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." 133 S.Ct. at 1417-18. The United States suggests that <u>Jardines</u> should be limited to its facts, and that the officers' transgression in that case was the use of the dogs rather than the intrusion onto the property. But if that were the essence of <u>Jardines</u>' holding, the Supreme Court could simply have applied its previous holding in <u>Kyollo v. United States</u>, 533 U.S. 27, 40 (2001), that using a thermal imager "to explore details of the home that would previously have been unknowable without physical intrusion" is a presumptively unreasonable search, even when conducted from a public street. "It is not the dog that is the problem, but the behavior that here involved use of the dog." <u>Jardines</u>, 133 S. Ct. at 1416, n. 3.

Instead of focusing on the tools the officers used to conduct their search, the <u>Jardines</u> court's analysis focused almost entirely on the officers' purposes and actions when entering the area around the home:

> But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*. An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker. To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. *The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.* Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics. Here, the background social norms that invite a visitor to the front door do not invite him there *to conduct a search.*

United States District Court
Northern District of California

8

The State points to our decisions holding that the subjective intent of the officer is irrelevant. See Ashcroft v. al–Kidd, 563 U.S. ——, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). But those cases merely hold that a stop or search that is objectively reasonable is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason. Thus, the defendant will not be heard to complain that although he was speeding the officer's real reason for the stop was racial harassment. See id., at 810, 813, 116 S.Ct. 1769. Here, however, the question before the court is precisely  whether the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn *depends upon the purpose for which they entered.* Here, their behavior *objectively reveals a purpose to conduct a search*, which is not what anyone would think he had license to do.

133 S. Ct. 1409 at 1416-17 (all emphases after the first added).  After this analysis, it is impossible

to conclude that the officers' intent is irrelevant to the inquiry of whether the officers acted within

the scope of an implied license to visit the home.  After Jardines, the officers' purpose, as revealed

by an objective examination of their behavior, is clearly at least an important factor.

Just as the behavior of the officers in Jardines "objectively reveals a purpose to conduct a

search," 133 S.Ct. at 1417, the behavior of the officers here objectively reveals a purpose to locate

Defendant so that the officers could arrest him.  Deputy Aponte had put out a request that Lundin

be arrested; he believed that the officers already had probable cause for such an arrest; and the

officers who arrived at the home were responding to Deputy Aponte's BOLO.  Even before

Jardines, the Ninth Circuit held that "at most, the knock and talk exception authorizes officers to

enter the curtilage to initiate a consensual conversation with the residents of the home."  Perea-

Rey, 680 F.3d at 1189.  Under the circumstances of this case, it is very difficult to imagine why

the officers would have been seeking  to initiate a consensual conversation with Lundin to ask him

questions at four o'clock in the morning.  Indeed, at oral argument, when asked the purpose of the

officers' visit, counsel for the United States offered no purpose other than to find Lundin.

Just as the officers' clear purpose in Jardines – to search the curtilage for evidence – could

not be pursued without a warrant, so too was the officers' clear purpose in this case – to arrest a

suspect within his home – a goal whose attainment requires a warrant.  See Payton v. New York,

445 U.S. 573, 601-02 (1980).  Even if the officers' intent was only to find out whether Lundin was

at home, that purpose was essentially the same as that possessed by the Jardines officers: to search

for information and evidence within an area protected by the Fourth Amendment.

It is unclear whether Jardines held that the officers' objectively discernible purpose is a *dispositive* factor in analyzing whether an officers' visit falls within the scope of a lawful knock-and-talk.  For example, imagine that a defendant leaves a gun on his front porch, in a spot where it is plainly visible to anyone on the porch, but is hidden behind a potted plant and therefore invisible to anyone standing on the sidewalk.  If an officer approaches the front steps of the house at high noon, and sees the gun lying on the floor of the porch, is he prohibited from seizing the gun as evidence?  After Jardines, does the answer to this question hinge on his objectively discernible intentions: if he intended to knock on the door to ask questions of the occupants, he may seize the gun, but if he intended to look for evidence, he may not?

That question may be presented by another case.  To resolve this case, the court notes only that the fact that the officers' purpose was to locate Lundin and arrest him is at least a significant factor weighing in favor of finding that the approach was not permissible without a warrant.

### 2.    The Time of the Search

Besides the officers' manifest intent, the other significant factor here is the time of the officers' visit:  four o'clock in the morning, a time at which most residents do not extend an implied license for strangers to visit.  On several occasions, courts have emphasized that the implied license to visit is generally understood to extend during daylight hours.  See, e.g., Crapser, 472 F.3d at 1146 (quoting Davis v. U.S., 327 F.2d 301, 303 (9th Cir. 1964) ("[t]here is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, *at high noon*, to walk up the steps and knock on the front door of any man's 'castle' with the honest intent of asking questions of the occupant thereof") (emphasis added).  In Jardines, all nine justices indicated some degree of agreement with the proposition.  See Jardines, 133 S.Ct. at 1422 (Alito, J., dissenting) ("Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation"); see also id. at 1416, n. 3 (majority op.) ("the dissent quite rightly relies upon" the fact that a typical person would react to certain intrusions with great alarm "to justify its no-night-visits rule").

"A license may be implied from the habits of the country," id. at 1415 (quoting

10

United States District Court
Northern District of California

1    McKee v. Gratz, 260 U.S. 127, 136 (1922) (Holmes, J.), and it is stating the obvious to observe

2    that the "habits of the country" do not include making uninvited visits at 4:00 a.m.  Perhaps one

3    can imagine the case where a visit at that hour is constitutionally reasonable: when the evidence

4    shows that a resident regularly receives visitors at that hour, for example, or if a suspect can

5    clearly be seen from a public vantage point to be awake and active.  But the court need not (and

6    does not) reach that question, because here the evidence does not show that it was anything other

7    than unusual, and constitutionally unreasonable, for officers to visit Lundin's home at 4:00 a.m.

8         The government does offer one piece of evidence in support of the idea that Lundin might

9    have expected a visit at that hour:  Deputy Tomlin's statement in his report that, sometime around

10   that time, Officer O'Donovan "advised him that he located Lundin's truck which had arrived

11   home sometime within the last hour."  Exh. A to Anderson Decl., at C008, ECF No. 30-1.  But

12   there are two problems with this evidence.  First is that this statement, on its own, is hearsay and

13   lacks foundation.  In his declaration, Officer O'Donovan does not claim to have known how

14   recently the car had arrived, saying only "I drove to Defendant's address, where I observed a 2005

15   maroon Dodge pickup . . . that had been described as Defendant's vehicle."  O'Donovan Decl. ¶

16   4.  At oral argument, counsel provided no explanation of how the officers knew Lundin had

17   recently arrived.  More importantly, the fact that a resident arrives home at 3:00 a.m., standing

18   alone, is scant indication that he wishes to entertain visitors at 4:00 a.m.  A more reasonable

19   conclusion is that, having come home at a late hour, he wishes to sleep.

20        O'Donovan does declare that "[t]he lights were on inside the home."  Id.  But the court

21   cannot conclude that merely by leaving the lights on, the resident of a home extends an implied

22   license for strangers to visit at 4 a.m.  The fact that the entry onto the front porch took place at 4

23   a.m. is another compelling factor weighing in favor of the conclusion that the officer's approach to

24   the door exceeded the scope of a licensed visit.

25              **3.    Conclusion**

26        Although the purpose and timing of the officers' visit were both inconsistent with a "knock

27   and talk," there is some evidence that pushes the other way.  For example, officers did not identify

28   themselves as police, and did not "demand that the occupants open the door."  United States v.

1    Winsor, 846 F.2d 1569, 1573, n. 3 (9th Cir. 1988) (en banc); see also Cormier, 220 F.3d at 1109

2    (holding a "knock and talk" reasonable because, *inter alia*, the officer "never announced that she

3    was a police officer while knocking nor did she ever compel Cormier to open the door under the

4    badge of authority," and "[b]ecause there was no police demand to open the door").  The officers

5    also only knocked twice, and were not "unreasonably persistent in . . . [their] attempt to obtain

6    access to" the resident of the dwelling.  Cormier, 220 F.3d at 1109 (citing U.S. v. Jerez, 108 F.3d

7    684, 691-92 (7th Cir. 1997)).

8         But while these facts might tip the balance in a closer case, here they are insufficient to

9    render the officers' 4:00 a.m. visit constitutional.  By entering onto Lundin's curtilage at four in

10   the morning for the purpose of locating him to arrest him, the officers engaged not in in a lawful

11   "knock and talk" but rather in a presumptively unreasonable search.  Since the government has not

12   demonstrated that any exception to the warrant requirement applies, the search was

13   unconstitutional.

14        For this reason, all evidence obtained in the April 23 search of Lundin's backyard and

15   home must be suppressed as the fruits of the unconstitutional approach onto Lundin's curtilage.

16   From the front porch, officers were able to hear the sounds of Lundin from within the building.

17   The government has not met its burden to demonstrate that the officers could have heard those

18   sounds from beyond Lundin's curtilage.  It was only by hearing those sounds that the officers were

19   able to make any claim to lawfully obtaining the items within his home on April 23.  With the

20   exception of the "inevitable discovery" doctrine (which the court concludes at III-B-3, *infra*, does

21   not apply), all of the officers' arguments for the legality of the April 23 search stem from the

22   noises the officers' heard within.  If the officers "gain entry to premises by means of an actual or

23   threatened violation of the Fourth Amendment," they cannot invoke the "exigent circumstances"

24   doctrine.  King, 131 S. Ct. at 1862.  And the officers' claim to have effected a lawful "protective

25   sweep" requires them to detain Lundin, which they were only able to do because they were able to

26   hear that he was in the backyard.

27        **B.      April 23 Search of Backyard and Home**

28        Even if the approach to the front porch were constitutional, the court would still conclude

United States District Court
Northern District of California

1    that the items seized on April 23 must be suppressed because the officers' later actions also

2    violated the Fourth Amendment.

3            On April 23, the officers searched Lundin's apartment, an interior hallway, and the

4    enclosed back patio of the apartment, which was enclosed behind a high fence.  Exh. A to

5    Anderson Decl., at C009 (ECF No. 30-1); O'Donovan Decl. ¶¶ 8-10.  The United States does not

6    dispute that these areas are all either part of the home or its "curtilage," and that officers may not

7    search those areas without a warrant unless a recognized exception to the warrant requirement

8    applies.  See Sims v. Stanton, 706 F.3d 954, 959-60 (9th Cir. 2012), reversed on other grounds by

9    Stanton v. Sims, ___ U.S. ___, 134 S. Ct. 3, 7 (2013).   And the United States concedes that the

10   officers lacked a warrant.  But the government argues, in the alternative, that three different

11   exceptions to the warrant requirement apply.  The "burden of proving that a warrantless search or

12   seizure falls within an exception to the warrant requirement is on the government."  Scott, 705

13   F.3d at 416.  The court addresses each of the government's arguments in turn.

14           **1.      Protective Sweep/Search**

15           The United States first argues that the search of the backyard was legal because it was a

16   "protective sweep incident to arrest."  At the beginning of this analysis, some careful taxonomy is

17   in order.  Ninth Circuit authority draws a fine distinction between "a protective sweep in

18   conjunction with an in-home arrest" and a "protective search incident to arrest."  United States v.

19   Lemus, 582 F.3d 958, 963, n.2 (9th Cir. 2009).  Officers may conduct a "protective *search*

20   incident to the arrest" without probable cause or reasonable suspicion, but may only search areas

21   that "'immediately adjoin[]' the area of arrest . . . 'from which an attack could be immediately

22   launched.'"  Lemus, 582 F.3d at 963 (quoting Maryland v. Buie, 494 U.S. 325, 335 (1990)).

23   Under Lemus's reading of Buie, officers may conduct a "protective *sweep*" of a somewhat larger

24   area, but only on the basis of "articulable facts which, taken together with the rational inferences

25   from those facts, would warrant a reasonably prudent officer in believing that the area to be swept

26   harbors an individual posing a danger to those on the arrest scene."  Buie, 494 U.S. at 334.

27           In its papers, the United States calls the officers' actions a "protective sweep incident to

28   arrest," cites "protective sweep" cases, and argues that the officers had reasonable suspicion to

United States District Court
Northern District of California

13

1    conduct the sweep.  See Opp. 10-11, ECF No. 34.  At oral argument, however, counsel for the

2    United States argued that both doctrines might apply.

3        As counsel conceded, however, under either doctrine, the officers' detention of the suspect

4    must be lawful for the protective search or sweep to be lawful.   Therefore, the lawfulness of the

5    detention is one of the elements the government must prove to establish the applicability of either

6    the "protective search" or "protective sweep" exceptions to the warrant requirement.

7        In light of "the overriding respect for the sanctity of the home that has been embedded in

8    our traditions since the origins of the Republic," it is well established that officers may not enter a

9    suspect's home to arrest him without a warrant.  Payton, 445 U.S. at 601-02.  The rule applies

10   "inside a home or its curtilage."  United States v. Struckman, 603 F.3d 731, 747 (9th Cir. 2010).

11   The United States does not dispute that Lundin was within his home's curtilage at the time he was

12   told to put his hands in the air and come out slowly.  See O'Donovan Decl. ¶ 8 ("we could hear

13   Defendant in the backyard").

14       The United States argues that "Defendant voluntarily opened the gate to the backyard and

15   came out himself."  Opp. 11.  Although it is not spelled out in the papers, it is presumably the

16   United States' position that, if Lundin left his home voluntarily, the officers were permitted to then

17   arrest him on public property, since they had probable cause to believe he had engaged in criminal

18   activity.

19       But the government's description of the exit as "voluntary" is irreconcilable with the

20   record.  Officer O'Donovan states specifically that the officers "loudly identified [them]selves as

21   police, and shouted for Defendant to put his hands in the air and come out slowly."  O'Donovan

22   Decl. ¶ 7.  Deputy Tomlin states that he "started shouting at whoever was on the back patio to

23   come out with their hands up."  Exh. A to Anderson Decl., at C0008, ECF No. 30-1.

24       A seizure occurs when a "reasonable person would not have felt free to disregard . . . [an

25   officer's] directions, end the encounter . . .  and leave the scene."  United States v. Washington,

26   490 F.3d 765, 774 (9th Cir. 2007) (citing Florida v. Royer, 460 U.S. 491, 501-02 (1983)).  No

27   reasonable person in Lundin's position would have felt free to disregard the officers' orders that

28   he come out with his hands up.  Lundin was seized at the moment the officers issued that

United States District Court
Northern District of California

14

1    command.  And at that time, he was within the curtilage of his home.  If officers may not arrest a

2    suspect in his home without a warrant, it follows necessarily that they cannot order him to leave

3    his home so that he may be arrested without a warrant.

4        It is plain from the record that Lundin did not "voluntarily" exit his home's curtilage.  The

5    United States provides no argument that would permit such an in-home seizure to occur without a

6    warrant.  Since the United States has failed to demonstrate that it constitutionally seized Lundin, it

7    has failed to meet its burden of demonstrating the applicability of either the "protective sweep" or

8    "protective search" exceptions to the warrant requirement.[3]

9                    **2.    Exigent Circumstances**

10       Second, the United States maintains that the warrantless search of the background was

11   permissible under the "exigent circumstances" exception to the warrant requirement.  "One well-

12   recognized exception [to the warrant requirement] applies when 'the exigencies of the situation'

13   make the needs of law enforcement so compelling that [a] warrantless search is objectively

14   reasonable under the Fourth Amendment.'"  King, 131 S. Ct. at 1856 (quoting Mincey v. Arizona,

15   437 U.S. 385, 394 (1978)).[4]

16       "'[E]xigent circumstances,' include the need to protect an officer or the public from

17   danger, the need to avoid the imminent destruction of evidence, when entry in 'hot pursuit' is

18   necessary to prevent a criminal suspect's escape, and to respond to fires or other emergencies.'"

19   Washington, 387 F.3d at 1071, n.10 (quoting U.S. v. Brooks, 367 F.3d 1128, 1133, n. 5 (9th Cir.

20   2004)).  If those circumstances apply, the guns would not need to be suppressed, since "the police

21   may seize any evidence that is in plain view during the course of their legitimate emergency

22   activities."  United States v. Stafford, 416 F.3d 1068, 1076 (9th Cir. 2005).  The United States

23

24   _____

     [3] Notably, the United States does not argue that the officers' command was a constitutional Terry

25   stop.  Instead, it argues instead that no seizure occurred.

26   [4] Since, as discussed at III-A, *supra*, the officers here created the claimed exigency by intruding
     into Lundin's curtilage without a warrant and in excess of the implied license to visit, the United
27   States may not invoke the "exigent circumstances" exception to the warrant requirement.  Like the
     rest of III-B, this analysis assumes *arguendo* that the intrusion onto the front porch was
28   permissible.

United States District Court
Northern District of California

argues that the first and second of these circumstances – protection from danger, and destruction of evidence – justify the warrantless search.  The court addresses each argument in turn.

### a.        Protection from Danger

In its papers, the government argues that the search of the backyard was permissible because "[o]fficers here were justifiably concerned that Defendant, whom they reasonably believed to be armed, was dangerous and would attempt to harm them or others."  Opp. 12:17-18. This argument is a poor fit for the facts, because the officers did not discover and seize the guns until they had already seized Lundin.  "[T]he police may seize any evidence that is in plain view during the course of their legitimate emergency activities," Stafford, 416 F.3d at 1076, but the legitimate emergency activity of neutralizing the threat from Lundin had already been completed when the officers entered the backyard and seized the guns they found there.  Lundin was handcuffed and in the back of a police car.

At the hearing, the government argued instead that the officers reasonably believed that individuals *other than* Lundin were inside the home and might have posed a danger to the officers. The government did not make that argument in its papers, and Defendant did not have an opportunity to address it before the hearing.[5]  But in any case, the government cites no cases suggesting that the government is entitled to invoke protection from danger as an exigent circumstance under the facts of this case.

In Minnesota v. Olson, 495 U.S. 91, 100 (1990), the United States Supreme Court considered the Minnesota Supreme Court's holding that, in considering whether one of the "exigent circumstance" factors apply, "in the absence of hot pursuit there must be at least probable cause to believe that one or more of the other factors justifying the entry were present."  The U.S.

---

[5] The United States does discuss the possibility of a threat from others within the house in the portion of its brief arguing that there was sufficient reasonable suspicion to conduct a "protective sweep."  Opp. 10-11.  The court does not address that argument because it concludes that, even if the officers had reasonable suspicion of danger, they did not lawfully detain Lundin.  See III-B-1, *supra*.  To consider the broadest possible consideration of the government's arguments, the court herein transposes some of the government's arguments from that portion of the brief to this issue. However, as discussed *infra*, the "reasonable suspicion" standard that applies to the "protective search" inquiry is lower than the "probable cause" standard that applies to the "exigent circumstances" inquiry.

United States District Court
Northern District of California

1    Supreme Court held that that was "the proper legal standard." Id.  The question, then, is whether

2    the officers had probable cause to believe that a danger to officers was present.

3          Officer O'Donovan declares that the officers swept the backyard because "we knew

4    Defendant to be a member of the Mongols Motorcycle Gang and did not know if Defendants was

5    present at the home alone." O'Donovan Decl. ¶ 9. "We also wished to secure any firearms that

6    may be on the scene to ensure our own safety." Id.

7          The fact that officers "did not know if Defendants was present at the home alone" is of

8    little probative value by itself.  This is true in practically any case in which officers conduct a

9    sweep of a home.  The United States points to no facts tending to show Lundin was accompanied:

10   no other cars were parked in the driveway, no other voices were heard from within.  The only facts

11   the government offers as tending to show that a dangerous individual might have been in the yard

12   or the home are these: (1) that Lundin allegedly belonged to the Mongol motorcycle gang, (2) that

13   Miller reported that Lundin had told Miller that he was "going to get his Mongol brothers to get

14   me," (3) that Lundin told Hinds that Lundin had been robbed of marijuana in his home while his

15   two daughters were at the house, and (4) that Miller believed Lundin was operating a "grow" out

16   of the house.  Exh. A to Hansen Decl., at C0105-06, C0116, C0122, C0133, C0150 (ECF Nos. 29-

17   3 & 29-4).

18         These facts suggest the possibility, although not the likelihood, that others could have been

19   within the home.  But the government cites no cases indicating that facts such as these support a

20   finding of probable cause to believe that dangerous persons within a home posed a danger to

21   officers.  In Mincey, 437 U.S. at 393-95, and in Olson, 495 U.S. at 100, the Supreme Court

22   rejected the use of the exigent circumstances exception.  In another of the government's cited

23   cases, the Supreme Court emphasized that the "seizures occurred prior to or immediately

24   contemporaneous with . . . [a suspect's] arrest, as part of an effort to find a suspected felon, armed,

25   within the house into which he had run only minutes before the police arrived." Warden, Md.

26   Penitentiary v. Hayden, 387 U.S. 294, 299 (1967).  The officers in that case acted on information

27   that the dangerous person had just entered the house.  Id.

28         The final citation on which the government relies is dicta in a consent search case.  See

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    Georgia v. Randolph, 547 U.S. 103, 118 (2006) ("it would be silly to suggest that the police would

2    commit a tort by entering, say, to . . . determine whether violence (or threat of violence) has just

3    occurred or is about to (or soon will) occur").  The Randolph court was also explicitly discussing

4    whether entry in that situation was a *tort*, not whether it was an unreasonable search that violated

5    the Fourth Amendment.  See id. ("[t]he dissent's argument rests on the failure to distinguish two

6    different issues: when the police may enter without committing a trespass, and when the police

7    may enter to search for evidence").[6]

8                         **b.       Destruction of Evidence**

9           The government also argues that "[t]he crash at the rear of the residence provided police

10   with a reasonable suspicion that Defendant was in the process of attempting to discard or destroy

11   evidence."  Opp. 13:16-18.  Again, however, since Lundin was in custody at the time of the April

12   23 search, any fear of destruction of evidence was contingent upon the likelihood that another

13   person was inside to perform the destruction.  In all of the cases cited by the government in which

14   a court upheld a warrantless search under the destruction-of-evidence doctrine, officers had

15   significant reason to believe (and were correct in believing) that there were individuals within the

16   area searched who were in a position to destroy evidence.  See King, 131 S.Ct. at 1856 (police

17   smelled marijuana, had observed a suspect entering a room, and heard people inside moving after

18   officers knocked on the door); United States v. McLaughlin, 525 F.2d 517, 519 (9th Cir. 1975)

19   ("[w]hile knocking, the agents heard shuffling from within and proceeded to enter the house");

20   United States v. Bustamante-Gamez, 488 F.2d 4, 6-7 (9th Cir. 1973) ("one of the agents walked up

21   a short driveway to the garage door at the 11262 address and heard sounds which he described as

22   'cloth dragging on the cement floor, a grunt, groan, and a tool hitting the floor,'" and then after

23   knocking the officers feared those inside would destroy evidence).

24   _____

25   [6] There were constitutional means at the officers' disposal, had they chosen to avail themselves of
     them.  Rather than seizing the guns during the sweep, they could have secured the premises,
26   ensured that no one was inside, and then posted an officer to ensure that no one else entered the
     home while a search warrant was prepared.  If they had chosen that route, the officers could have
27   seized the guns during that later, warranted, search (as long as the warrant was based on probable
     cause that the officers already possessed before seeing the guns during the sweep).  See Murray v.
28   U.S., 487 U.S. 533, 535-36 (1988).

                                              18

The officers might have been justified in entering the house or the yard without a warrant to stop *Lundin* from destroying evidence. But once Lundin was in custody, the fear that Lundin would destroy evidence was obviously dissipated. And without probable cause to believe that others were inside, the officers were not justified in conducting a warrantless search.

### 3.   Inevitable Discovery

Finally, the United States argues that the "inevitable discovery" doctrine permits admission of evidence even if the searches were unconstitutional. The government's papers are unclear about which evidence it seeks to introduce under this doctrine. The government's opposition brief states that "[e]ven if Defendant is correct and all of the initial searches in the early morning of April 23 were illegal as violations of the Fourth Amendment, *the evidence from the subsequent search on April 24 . . . should be admitted under either the independent source or the inevitable discovery doctrine.*" Opp. 14-15 (emphasis added). But later, the brief says that "even if *the initial searches were illegal*, <u>Murray [v. United States</u>, 487 U.S. 533, 539 (1988)] dictates that the evidence seized during *those searches* be admitted as inevitable discovery of the subsequent, warranted search." <u>Id.</u> at 16 (emphases added).

It is possible to read the first sentence as conceding that the two guns seized on April 23 cannot be admitted pursuant to the inevitable discovery doctrine, and that those guns are inadmissible if neither the "protective sweep" nor the "exigent circumstances" exceptions apply. However, the court will not assume that the government has abandoned an argument absent a clear statement to that effect. Therefore, this analysis assumes that the government seeks to introduce even the items seized on April 23 pursuant to the inevitable discovery doctrine. The court addresses the government's argument regarding the items seized in the April 24 search at Part III-B-4, *infra*.

Defendant argues that the government has failed to meet its evidentiary burden in establishing that this exception to the warrant requirement applies. Defendant's Reply Brief at 15. This court agrees.

The inevitable discovery rule prevents the suppression of illegally obtained evidence "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or

19

United States District Court
Northern District of California

1    inevitably would have been discovered by lawful means." <u>Nix v. Williams</u>, 467 U.S. 431, 444

2    (1984); <u>see also</u> <u>United States v. Boatwright</u>, 822 F.2d 862, 864-65 (9th Cir. 1987); <u>United States</u>

3    <u>v. Young</u>, 573 F.3d 711, 721 (9th Cir. 2009).  The purpose of this rule is to put the police in the

4    "same, not a worse, position that they would have been in if no police error or misconduct had

5    occurred." <u>Nix</u>, 467 U.S. at 443.  The government must meet its burden of proof by relying on

6    "demonstrated historical facts capable of ready verification or impeachment" rather than

7    "speculative elements." <u>Nix</u>, 467 U.S. at 443 n.5. The Ninth Circuit has "never applied the

8    inevitable discovery exception so as to excuse the failure to obtain a search warrant where the

9    police had probable cause but simply did not attempt to obtain a warrant," <u>United States v. Mejia</u>,

10   69 F.3d 309, 320 (9th Cir. 1995), because that would "completely obviate the warrant

11   requirement." <u>Id.</u> (quoting <u>United States v. Echegoyen</u>, 799 F.2d 1271, 1280, n.7).

12          In <u>Nix</u>, the Supreme Court first explicitly endorsed the inevitable discovery rule.  467 U.S.

13   at 444.  There, police led two hundred volunteers in a systematic search for the body of a missing

14   ten-year-old girl in an area where the body was believed to have been left by the defendant.  <u>Id.</u> at

15   448.  Police halted the search after illegally learning the exact whereabouts of the girl's body from

16   the defendant, in violation of his <u>Miranda</u> rights.  <u>Id.</u> at 449.[7]  The record established that the

17   search party was closing in on the location of the body, which would have likely been found

18   within three to five hours of additional searching.  <u>Id.</u>  The defendant argued that evidence

19   concerning the location and condition of the body should be suppressed as "fruit of the poisonous

20   tree" and that "the record only contain[ed] the 'post hoc rationalization' that the search efforts

21   would have proceeded" to the location where the body was found.  <u>Id.</u> at 441, 448.  Because the

22   Supreme Court found the record established that the "body inevitably would have been found"

23   shortly after it was found, the Court prevented suppression of the evidence concerning the location

24   and condition of the body.  <u>Id.</u> at 450.

25          On the other hand, in <u>Young</u>, the Ninth Circuit found the inevitable discovery rule not

26   satisfied in a felon-in-possession-of-a-firearm case.  573 F.3d at 713.  There, after hotel staff found

27   _____

28   [7] It is now well-established that the "inevitable discovery" rule applies to other constitutional
     violations, such as unreasonable searches.  See <u>Young</u>, 573 F.3d at 713.

a firearm in the defendant's room, the staff left the firearm in the room, locked the defendant out of his room, and called the police. <u>Id</u>. at 714.  Calling the police contravened the hotel's written policy that required the hotel to inform its guests of the hotel's policy against possession of weapons and offer to store the firearm for the duration of the guest's stay. <u>Id</u>.  A police officer arrived at the hotel, learned that the defendant had been to prison and that hotel staff had found a gun in the defendant's room, and then arrested the defendant. <u>Id</u>. at 715.  Next, after being told by his supervising officer not to enter the defendant's hotel room and search it, the arresting officer had the hotel staff search the defendant's room while he watched from the hallway. <u>Id</u>.  Upon seeing the gun, the officer entered the room and seized it. <u>Id.</u>

The Ninth Circuit, which described the search as a "warrantless search of a private residence, not incident to an arrest," <u>id</u>. at 722, reached two main conclusions in applying the inevitable discovery rule.  First, the government did not show by a preponderance of evidence that the defendant would not have returned to his room, but for the hotel's contravention of its written policy and the arresting police officer's illegal search. <u>Id</u>.  "Assuming that staff had followed the written policy . . .  it is entirely likely that after some discussion with hotel security, [the defendant] might have decided to store the firearm, or, alternatively, take his belongings with him and vacate the room." <u>Id</u>.  Second, "instead of getting a warrant, [the police officer] conducted a warrantless search" such that "[t]he only reason the police possession of the firearm was inevitable was because the officer did what officers sometimes do – he took a short cut." <u>Id</u>.  On the basis of these findings, the court held that the inevitable discovery rule did not apply to the evidence seized during the search of the defendant's hotel room. <u>Id</u>.

Here, in arguing that the guns seized during the warrantless search would have inevitably been discovered, the government focuses on the admissibility of the evidence seized in the subsequent, warranted, searches that occurred on April 24.  The United States argues "Aponte and Fulton had sufficient evidence to apply for a warrant" and that "[i]t is irrational to believe that . . . Aponte would not have sought a warrant to search [Defendant's] home." Opp. 15-16.  So far, so good.  However, establishing that the police would have promptly searched Defendant's home is only part of the analysis.

1      The <u>Nix</u> court relied not only on the fact that there was an independent *means* of finding

2    the body via the search party, but also on evidence that the search party ultimately *would* have

3    found the body.  467 U.S. at 449.  As applied to this case, <u>Nix</u> requires the government to show

4    that the guns seized in the backyard "would have remained in the same place and in the same

5    condition" or at least in a similar enough location that they would inevitably be discovered by

6    subsequent legal searches.  The government has failed to show that, at a minimum, the guns would

7    have been present in the home or backyard the next day, such that they would have inevitably

8    discovered by the police in any subsequent warranted search of Defendant's home.

9        Importantly, unlike <u>Nix</u>, in this case the evidence seized was not sitting in one place and

10   unlikely to be moved during the time period the investigators were likely to find it.   It was within

11   Lundin's domain and control and easily movable.  In <u>Young</u>, the Ninth Circuit held that, but for

12   the improper actions of the hotel and police, the defendant could have removed the guns from his

13   hotel room, and that the government had failed to establish otherwise.  573 F.3d at 722.  That

14   possibility was considered sufficient to take the situation outside the scope of the inevitable

15   discovery doctrine.  Here, the government has not shown that, had the April 23 seizure and search

16   not occurred, the Defendant could not have, or would not have, disposed of or moved the guns

17   prior to the April 24 search.  Even had the arrest been legal, the government has not demonstrated

18   that there is no chance other people could have entered the home and moved the guns prior to any

19   later legal search. Thus, it is entirely possible that by not suppressing the evidence of the initial,

20   warrantless search of the backyard, the police would be put in a better position because of their

21   misconduct.

22        Moreover, even if the government could meet its burden of proof regarding the inevitable

23   discovery rule, admission of the gun evidence from Defendant's yard is not appropriate because

24   applying the inevitable discovery rule would "excuse the failure to obtain a search warrant where

25   the police had probable cause but simply did not attempt to obtain a warrant."  <u>Mejia</u>, 69 F.3d at

26   320.

27        The government argues <u>Mejia</u> does not apply because "Deputy Aponte had already

28   requested the Defendant be arrested . . . and asked Deputy Fulton to prepare a warrant application

United States District Court<br>Northern District of California

shortly after the alleged illegal searches." Opp. 15.  Defendant argues that the police "had time to [secure a warrant] before the first search and did not."  Reply 16.  Defendant appears to be correct. Deputy Aponte concluded his interview with Hinds at about 2 a.m., issued a BOLO for Lundin at that time, and then began preparing an incident report at about 2:20 a.m.  Exh. B to Hansen Decl., at C0003, 158-59.  But neither he nor any of his fellow officers sought either a search warrant or an arrest warrant at any point before officers went to Lundin's house at 4 a.m.

Because there are no legitimate reasons for the police to have searched Defendant's yard subsequent to his arrest, see discussion *supra*, the police could have, and thus should have, obtained a warrant prior to entering the backyard.  In <u>Young</u>, the police chose to illegally search the defendant's hotel room rather than wait for a warrant. 573 F.3d at 722.  Here, the police similarly jumped the gun by searching Lundin's house without attempting to secure a search warrant.

Applying the "inevitable discovery" exception requires particular care.  At one end of the spectrum, the doctrine must allow for cases such as <u>Nix</u>, in which a nonconsequential constitutional violation should not penalize law enforcement any further than the exclusionary rule itself demands.  But at the other extreme, if applied too loosely, the "inevitable discovery" exception could begin to swallow the exclusionary rule.  "[T]he argument that '[i]f we hadn't done it wrong, we would have done it right,' is far from compelling."  <u>State v. Topanotes</u>, 76 P.3d 1159, 1164 (Utah 2003) (<u>quoting</u> <u>U.S. v. Thomas</u>, 955 F.2d 207, 210 (4th Cir. 1991)).  Here, applying <u>Mejia</u>, the court concludes that the exception does not apply when the officers could have obtained a search warrant but did not.

### 4.     Effect of Suppressing the Fruits of the April 23 Search

For the foregoing reasons, the court concludes that the government has failed to justify the officers' April 23 warrantless search.  The guns seized in that search must be suppressed as the fruits of an unconstitutional search.

The court does not, however, agree with Defendant that the fact that the April 23 seizure and search were unconstitutional requires all evidence obtained in the April 24 search to be suppressed.  Because the evidence from the April 24 search was obtained pursuant to a warrant

1  partially based on evidence seized during an illegal search, the most applicable case is <u>Murray v,</u>

2  <u>U.S.</u>, 487 U.S. 533 (1988).  There, officers learned about the contents of a warehouse through a

3  search assumed to be unlawful, but officers seized no evidence during that search.  <u>Id.</u> at 535.  The

4  agents then applied for a warrant, and "[i]n applying for the warrant, the agents did not mention

5  the prior entry, and did not rely on any observations made during that entry."  <u>Id.</u> at 535-36.  The

6  Supreme Court held that evidence was admissible provided the "warrant-authorized search of the

7  warehouse was an independent source of the challenged evidence."  <u>Id.</u> at 544.

8          As Defendant points out, "[t]he Ninth Circuit, in applying <u>Murray</u>, has held that a two step

9  process need be undertaken when a warrant is obtained after an illegal search has been undertaken:

10  first, the court must purge the search warrant affidavit of any information gleaned as a result of the

11  illegal search; and second, the agents must prove to the court's satisfaction that they would have

12  applied for a warrant even without the information they gleaned from the illegal search."  Reply at

13  14  (citing <u>United States v. Duran-Orozco</u>, 192 F.3d 1277, 1281 (9th Cir. 1999)).  Unlike in <u>Nix</u>

14  and <u>Young</u>, the <u>Murray</u> and <u>Duran-Orozco</u> courts did not impose upon the government the

15  additional burden of proving that the actually seized evidence would have stayed in the same

16  location between the time it was unlawfully discovered and the time it was lawfully seized.

17          In their statement of probable cause, the officers focused primarily on the officers'

18  interviews with Hinds, in which she relayed the fact that Lundin had recently assaulted and

19  kidnapped her, forced her to take drugs, and brandished two firearms.  Exh. B to Anderson Decl.,

20  at C0075-76 (ECF No. 30-4).  In suppressing the evidence obtained on April 23, the court must re-

21  imagine the probable cause statement after "purging" it of several facts: that Lundin was located at

22  his residence at 4 a.m. on April 23, that two firearms were located in his home at that time, and

23  that Lundin was not in possession of his cell phone when he was arrested.  <u>Id.</u>  The fact that

24  Lundin's car was located at his address need not be purged, since officers could have observed

25  that fact without conducting the unreasonable seizure and search.

26          After "purging" the statement of probable cause of those specific facts, the court concludes

27  that the statement establishes probable cause to believe that Lundin had recently committed assault

28  and kidnapping using firearms and drugs, and that he was likely to be a member of the Mongol

1   motorcycle gang.  The statement also established probable cause to believe that guns used in the

2   assault, Lundin's cell phone, drugs, and Mongol-related indicia and paraphernalia would be inside

3   the home.  All of these fall within the types of items seized on April 24.  Exh. A to Anderson

4   Decl., at C0005-6 (ECF No. 30-1).

5          The court also concludes that, given the seriousness of the alleged crime, the officers

6   would have conducted a search warrant for the home even had they yet to discover there were two

7   guns inside and had yet to detain Lundin.

8          The court next turns to the validity of the remainder of the April 24 search warrant.

9          **C.     Sufficiency of the April 24 Warrant**

10         Defendant also argues that, independent of the issues with the April 23 search, there are

11  two problems with the warranted April 24 search.  First, he argues that the warrant application

12  contained false and material misrepresentations, which, pursuant to <u>Franks v. Delaware</u>, 438 U.S.

13  154, 155-56 (1978), require the court to hold an evidentiary hearing.  Second, he argues that the

14  warrant was overly broad and lacked a sufficient statement of probable cause.

15                 **1.     False or Misleading Statements**

16         Defendant points to the following three statements or omissions in the affidavit officers

17  submitted in support of a warrant to search Defendant's home on April 24: (1) Hinds' and Miller's

18  statements regarding Lundin's membership in the "Mongol" motorcycle gang; (2) the failure to

19  relay one officer's apparent belief that Lundin was a *retired*, rather than current, "Mongol," and

20  (3) the failure to disclose the resemblance of the guns seized on April 23 to those described in

21  Hinds' statement.  All three arguments fail.

22         To justify a <u>Franks</u> hearing, defendant must make a "substantial preliminary showing" that

23  (1) a false statement was either intentionally or "with reckless disregard for the truth" included in a

24  warrant affidavit, and (2) the false statement materially affected a finding of probable cause.  <u>Id.</u> at

25  155-56.  Merely showing that statements are not true does not meet the defendant's burden so long

26  as "the information put forth [in the affidavit was] believed or appropriately accepted by the

27  affiant as true."  <u>Id.</u> at 164-65.  If, during a <u>Franks</u> hearing, the defendant can meet the same

28  criteria by a preponderance of the evidence, the court must determine if the warrant would have

United States District Court
Northern District of California

25

1    been granted, but for the false statements.  <u>See</u> <u>id</u>. at 156.  If the court finds no probable cause, all

2    evidence seized pursuant to the warrant must be suppressed.  <u>Id</u>.

3         <u>Franks</u> also applies to "deliberate or reckless omissions of facts that tend to mislead."

4    <u>United States v. Stanert</u>, 762 F.2d 775, 781 (9th Cir. 1985).  "All that is required is that the

5    defendant make a substantial showing that the affiant intentionally or recklessly omitted facts

6    required to prevent technically true statements in the affidavit from being misleading."  <u>Id</u>.

7         In the statement of probable cause, Detective Fulton provided a copy of Deputy Aponte's

8    report regarding his conversation with Hinds.  Exh. B to Anderson Decl., at C0075 (ECF No. 30-

9    4).  That report states: "Lundin repeatedly made comments that . . . he was a member of the

10   Mongols motorcycle gang."   <u>Id</u>.  This statement is more imprecise than untrue.  Hinds only said

11   that Lundin had said he was a "Mongol," and she may not have understood what that term meant,

12   since she asked the officer "Is the Mongols bad?"  But Deputy Aponte readily understood

13   Lundin's reference.

14        When Ms. Hinds relayed that Lundin used the term "Mongols," the deputy was entitled to

15   conclude that Lundin meant the Mongols motorcycle gang.  The Hell's Angels analogy the

16   defendant uses in his papers is actually quite instructive.  The defendant says that if a witness said

17   that a suspect was an angel, that would not be grounds for assuming that the suspect was a

18   member of the Hell's Angels motorcycle gang.  That might be true.  "Angel" has several different

19   meanings.  But if the witness said the suspect was a *Hell's* Angel, then any reasonable officer

20   would be justified in thinking that the suspect was a member of the Hell's Angels motorcycle

21   gang.  Similarly, when someone is described as a "Mongol," then a reasonable officer is justified

22   in thinking that person is a member of the Mongols Motorcycle gang.  Indeed, if the term

23   "Mongol" was supposed to have another meaning to Deputy Aponte, defendant does not say what

24   that is.

25        Defendant has not shown that this statement was an intentionally or recklessly false

26   statement that materially affected the statement of probable cause.  The statement was

27   "appropriately accepted by the affiant as true."  <u>Franks,</u> 438 U.S. at 164-65.  If stated more

28   precisely – "Lundin repeatedly made comments that . . . he was a 'Mongol,' which the

1   interviewing officer recognized as a likely reference to the Mongols motorcycle gang," – the

2   search warrant would almost certainly still have issued, and so any "misrepresentation" was not

3   material.  It is doubtful, for example, that the magistrate would have needed to consider the

4   possibility that Mr. Lundin was merely identifying the fact that he or his family were from

5   Mongolia.

6          Defendant's second argument is that the application omitted the fact that at least one

7   officer apparently believed the Defendant to be a *retired* member of the Mongol's motorcycle

8   gang.  This, too, is unavailing because Defendant has failed to make a preliminary showing that

9   this omission was deliberate or reckless.  Fatal to Defendant's argument is that Lundin's own

10  alleged words contradict the contention that he was no longer an active member of the gang.

11  Lundin allegedly told Hinds "that's what us Mongols do" and "we leave no witnesses."  Exh. A to

12  Hansen Decl., at C0105-06.  Lundin allegedly threatened Miller with retribution from his "Mongol

13  brothers."  Id. at C0150.  Because of the substantial weight of evidence contradicting the

14  contention that Lundin was "retired," including a statement by a single officer that Lundin was

15  "retired" would not materially affect a finding of probable cause.

16         Finally, Defendant argues that the affidavit omitted the fact that the two seized guns

17  resembled those described by Hinds in her statement to Deputy Aponte.  First, Defendant's

18  conclusory argument that "the omitted fact that Dep. Aponte recognized the recovered guns as

19  matching the description provided by Ms. Hinds was the kind of thing the judge would wish to

20  know" falls short of being a substantial showing that the fact was recklessly omitted.  Motion at 24

21  (internal quotation marks omitted). Second, while a magistrate may be less willing to issue a

22  warrant to search for guns allegedly used in a crime if those guns may have already been found, in

23  this case, the magistrate was already aware of this possibility because the facts that two guns had

24  been recovered during the April 23 search was included in the affidavit.  The additional fact that

25  the guns matched a general description given by Hinds would likely not have a material effect on

26  whether or not there was probable cause at the time the warrant was requested.

27                    **2.      Breadth of the Warrant**

28         Defendant also argues that the warrant was overbroad.  He argues that there was no

27

1 probable cause to search the home for additional guns, since the officers had already seized two

2 guns that resembled the guns Hinds recalled seeing Lundin brandish during their encounter.  But

3 the description of the guns was fairly generic and uncertain, and so there was still a "fair

4 probability" that the guns used in the assault would be found within the home.  United States v.

5 Luong, 470 F.3d 898, 902 (9th Cir. 2006) (quoting Gates, 462 U.S. at 288).  And since Defendant

6 was a felon, it was illegal for him to own *any* firearms, and the fact that Hinds had seen him

7 brandish firearms created a "fair probability" that he might own others and keep them in his home.

8      Defendant argues that the warrant was overbroad in allowing a search for any and all cell

9 phones.  The officers had no more specific description of the phone Lundin used during the

10 alleged abduction that would have allowed them to "describe the items more particularly in light

11 of the information available to . . . [them] at the time the warrant was issued."  United States v.

12 Vasquez, 654 F.3d 880, 884 (9th Cir. 2011).

13      Third, Defendant argues that "there was no cause to search Mr. Lundin's home for indicia

14 of gang membership or gang activities."  Motion 25:17-18.  To justify a search warrant, there must

15 be a "nexus" between "the item to be seized and criminal behavior."  Warden v. Hayden, 387 U.S.

16 at 307.  The court agrees with the United States that the "nexus between the criminal activity and

17 the items to be seized is clear—Defendant made repeated threats, backed up by his affiliation with

18 the Mongols motorcycle gang."  Opp. 24:3-5.  Indicia of his membership in the gang would be

19 relevant to assessing the validity of those threats.

20      Finally, even assuming *arguendo* that warrant might have been overbroad, there are no

21 "clear indicia of bad faith" which would require suppression of the evidence.  United States v.

22 Crews, 502 F.3d 1130, 1138 (9th Cir. 2007).

23      The court will not suppress evidence seized in the April 24 search.

24 **C.  Miranda Violation**

25      Defendant argues, and the United States does not dispute, that officers questioned Lundin

26 twice in violation of his Miranda rights: first, when an officer asked him "[y]ou want to go by

27 Whitey or your, uh – your regular name?" shortly after he was arrested, and second, when officers

28 telephoned Lundin at the jail to ask him the combination to the gun safes in his home.  The United

United States District Court
Northern District of California

28

States agrees that it may not use the statements Lundin made in response to those questions in its case-in-chief.  Opp. 24-25.  The United States points out, and Defendant does not dispute, that while the statements themselves must be suppressed, any physical "fruits" of the statements are not suppressed.  See United States v. Patane, 542 U.S. 630, 636 (2004).

The motion to suppress Lundin's statements is granted insofar as it seeks to suppress the statements themselves from use in the government's case-in-chief.

## IV.   CONCLUSION

Defendant's motion to suppress is GRANTED IN PART insofar as it seeks to suppress the evidence seized in the April 23 search, and insofar as it seeks to suppress from the government's case-in-chief the statements Lundin made in response to the questions discussed at Part III-C, *supra*.  The motion is otherwise DENIED, as is Defendant's request for a Franks hearing.

**IT IS SO ORDERED.**

Dated:  June 26, 2014

_____
JON S. TIGAR
United States District Judge